UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY KRAMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 16 CV 4960 |
| ) | |
| THOMAS HOSKINSON, #233, ) | Judge Kennelly |
| Individually and as agent, servant or ) | |
| Employee of the Mount Prospect Police ) | |
| Department, UNKNOWN MOUNT ) | |
| PROSPECT OFFICERS, ) | |
| LLOYD MILLER, individually and as ) | |
| Agent, servant or employee of Mount ) | |
| Prospect Fire Department, UNKNOWN ) | |
| FIRE DEPARTMENT PERSONNEL ) | |
| and VILLAGE OF MOUNT PROSPECT, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' AMENDED LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS I - VII THE SECOND AMENDED COMPLAINT**

The Defendants, THOMAS HOSKINSON, LLOYD MILLER and the VILLAGE OF MOUNT PROSPECT, by and through their attorneys, KLEIN, THORPE AND JENKINS, as and for their amended statement of undisputed material facts in support of their motion for summary judgment on Plaintiff's Second Amended Complaint, pursuant to Local Rule 56.1(a)(3), state the following:

1. Plaintiff, Jeffrey Kraman ("Kraman") is a citizen of Illinois and the United States. (*Second Amended Complaint*, attached as *Exhibit 1* at ¶¶ 3).

2. Defendant, Thomas Hoskinson ("Hoskinson"), was employed by the Mount Prospect Police Department ("MPPD") on May 10, 2015, the date Kraman alleges Hoskinson committed the alleged misconduct. (*Exhibit 1* at ¶ 4).

3. Defendant, Lloyd Miller ("Miller") was employed by the Mount Prospect Fire Department ("MPFD") on May 10, 2015, the date Kraman alleges Miller committed the alleged misconduct. (*Exhibit 1* at ¶ 6).

4. Defendant, Village of Mount Prospect ("Village"), is an Illinois Municipal Corporation. (*Exhibit 1* at ¶ 5).

5. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1346, § 2860 and 42 U.S.C. § 1983 and § 1988; the Judicial Code, 28 U.S.C. § 1331 and § 1343(a); the Constitution of the United States; and supplementary jurisdiction, as codified in 28 U.S.C. § 1367(a). (*Exhibit 1*, ¶ 1).

6. Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division, because all of the conduct alleged in Plaintiff's Second Amended complaint occurred in this District. (*Exhibit 1*, ¶ 2).

7. On May 10, 2015, Hoskinson initiated a traffic stop after he observed a vehicle on which the rear license plate was covered by an obstruction device which caused the license plate to be unreadable if looked at from an angle. (*Deposition of Tom Hoskinson, dated March 13, 2017 and April 13, 2017*, attached and referred to as *Exhibit 2* at 30-31).

8. Having an obstruction device on the rear license plate was in violation of 625 ILCS 5/3-413(b). (*Exhibit 1*, ¶ 12(p); *625 ILCS 5/3-413(b),* attached and referred to as *Exhibit 3*).

9. Kraman was driving the vehicle Hoskinson pulled over. (*Exhibit 1*, ¶ 10, 12).

10. Kraman and Hoskinson drove their vehicles into the private parking lot of the United States Post Office located at 300 Central Road in the Village. (*Exhibit 2* at 31; *Video recording of traffic stop taken by Mount Prospect Police Department squad car dated May 10, 2015,* attached and referred to as *Exhibit 4* at 13:14:40[1]; *see Affidavit of Thomas Hoskinson dated August 17, 2017,* attached and referred to as *Exhibit 5* at ¶ 2-15; *Deposition of Jeffrey Kraman, dated March 9, 2017*, attached and referred to as *Exhibit 6* at 34).

11. Hoskinson approached Kraman's vehicle and told Kraman why he had been pulled over and requested his driver's license and proof of insurance. (*Exhibit 2* at 34; *Exhibit 4* at 13:16:21; *Exhibit 6* at 37-38).

12. Kraman informed Hoskinson that he was experiencing atrial fibrillation ("A-Fib") and needed an ambulance. (*Exhibit 2* at 31, 33, 34; *Exhibit 4* at 13:15:38; *Exhibit 6* at 33-34).

13. Hoskinson asked dispatch to send an ambulance to the scene of the traffic stop. (*Exhibit 2* at 34).

14. Kraman was pulled over at approximately 13:15:14. (Exhibit 4 at 13:15:14; *Tom Hoskinson's Mount Prospect Police Department Personnel File*, attached and referred to as *Exhibit 7* at 10-11; *see Exhibit 2* at 140-176).

15. A Mount Prospect Fire Department ("MPFD") ambulance was dispatched to 300 Central Road at 13:16 which was within 1 minute of the beginning of the traffic stop. (*Deposition of James Ingebrigtsen, dated April 5, 2017*, attached and referred to as *Exhibit 8* at 49*; Mount Prospect Fire Department Comprehensive Report,* attached and referred to as *Exhibit 9* at 1; *see Deposition of Lloyd Miller, dated April 12, 2017*, attached and referred to as *Exhibit 10* at 5-7, 21-22).

---

[1] The DVD of the May 10, 2015 traffic stop is time-stamped throughout in military time fashion – e.g. "13:15:14."

16. Hoskinson returned to his squad car with Kraman's driver's license and remained in his squad car until the ambulance arrived. (*Exhibit 2* at 34; *Exhibit 4* at 13:17:54-13:23:33).

17. Hoskinson removed the obstruction device from Kraman's rear license plate. (*Exhibit 4* at 13:27:28-13:30:53).

18. Hoskinson patted down Kraman at approximately 13:23:40, directed him to the ambulance at approximately 13:23:48 and Kraman got into the ambulance at approximately 13:23:55. (*Exhibit 2* at 62; *Exhibit 4* at 13:23:40; *Exhibit 8* at 42).

19. Hoskinson observed that the back of Kraman's vehicle contained boxes of retail items (small appliances), as well as an object that was covered by a blanket that appeared to Hoskinson to be in the shape of a body. (*Exhibit 2* at 44-48; *Deposition of Jeffrey Schmitz, dated March 16, 2017*, attached and referred to as *Exhibit 11* at 22).

20. Michael Jolie ("Jolie"), one of Hoskinson's fellow MPPD officers who came to the traffic stop location, testified in his deposition that he also saw what he thought was a body under a covering in the back of the vehicle. (*Deposition of Michael Jolie, dated March 15, 2017*, attached and referred to as *Exhibit 12* at 18, 34-35, 37-38).

21. The back of Kraman's driver's license was blank. (*Exhibit 2* at 48-49; *Exhibit 7* at 21; *Exhibit 11* at 28-29, 74, 77-78; *Exhibit 12* at 19, 43).

22. Hoskinson believed Kraman's demeanor to be unusual. (*Exhibit 2* at 53).

23. Hoskinson did not speak or otherwise interact with Kraman from the time he directed Kraman to the paramedics until Hoskinson entered the ambulance for the first time at approximately 13:44:30. (*Exhibit 4* at 13:23:48-13:44:30; *Deposition of Tim Skalon, dated April 26, 2017*, attached and referred to as *Exhibit 13* at 45-46).

24. Hoskinson told Kraman that he would like to search his vehicle in order to see what was under the tarp. (*Exhibit 2* at 232-233; *Exhibit 4* at 13:45:05).

25. Kraman told Hoskinson that he would show him what was under the tarp in the back of his vehicle. (*Exhibit 4* at 13:45:18).

26. Hoskinson asked Kraman about the retail items in the back of his vehicle and Kraman explained that he had items in his vehicle because he was involved in promotions. (*Exhibit 2* at 58; *Exhibit 4* at 13:49:50).

27. Kraman provided Hoskinson with the receipts for some of the items. (*Exhibit 2* at 58; *Exhibit 4* at 13:49:43).

28. All of the receipts that were given to Hoskinson by Kraman were gift receipts. (*Exhibit 2* at 58; *Exhibit 4* at 13:50:59).

29. During his career as a Mount Prospect Police Officer, Hoskinson has had limited experience working with retail theft and fraud and based on that experience knew that these gift receipts could be an indication of an attempt to create fraudulent returns. (*Exhibit 2* at 58).

30. The receipts were from a local Bed, Bath & Beyond. (*Exhibit 2* at 84-85; *Exhibit 4* at 13:51:57; *Exhibit 12* at 41-42).

31. Hoskinson asked Jolie to check on the receipts at approximately 13:55:08 while Hoskinson wrote the tickets. (*Exhibit 4* at 13:55:10).

32. Jolie called Bed, Bath and Beyond and spoke to a store representative who told the officer that the transactions for the merchandise were legitimate. (*Exhibit 2* at 84-85; *Exhibit 12* at 41-42, 49).

33. Jolie, at approximately 14:04:47, related the results of his call to Bed, Bath and Beyond to Hoskinson. (*Exhibit 4* at 14:04:47; *Exhibit 12* at 136).

34. After being pulled over by Hoskinson, Kraman exited his vehicle and moved towards the squad car. (*Exhibit 2* at 31; *Exhibit 4* at 13:15:38).

35. The ambulance arrived at the scene at approximately 13:23:10, which was about eight minutes after Hoskinson initiated the traffic stop. (*Exhibit 4* at 13:23:10; *Exhibit 8* at 49; *Exhibit 9* at 1).

36. Lloyd Miller ("Miller"), the treating paramedic or paramedic-in-charge, and Tim Skalon ('Skalon"), the driver, were in the ambulance and Jim Ingebrigtsen, Patrick Clarke and Jim Flory were on the accompanying firetruck. (*Exhibit 8* at 14; *Exhibit 10* at 6, 82-84; *Exhibit 13* at 8-9, 18-19; 54; *Deposition of Patrick Clarke, dated April 3, 2017*, attached and referred to as *Exhibit 14* at 12).

37. When Kraman was in the ambulance he was under the care and control of the paramedics as he was a patient of the paramedics. (*Exhibit 11* at 79, 80).

38. When paramedics are on the scene, they are in charge of the patient and the police officer has no medical authority over the patient. (*Exhibit 11* at 95-96).

39. Hoskinson believed that it was at the discretion of the paramedics whether or not Kraman was transported to the hospital. (*Exhibit 2* at 188).

40. When Kraman asked Hoskinson if he was under arrest, Hoskinson told Kraman that he was under the control of the fire department as he was in the ambulance at the time. (*Exhibit 4* at 13:46:12).

41. At approximately 13:53:45, Hoskinson asked the paramedics whether or not the situation was a medical emergency or if he was preventing Kraman from being treated to which one paramedic responded "No." (*Exhibit 4* at 13:53:45).

42. At approximately 13:33:09, Hoskinson told the paramedics that "Kraman's medical treatment was the priority and not to worry about me [Hoskinson]." (*Exhibit 2* at 224; *Exhibit 4* at 13:33:09).

43. Hoskinson was told by the paramedics that Kraman was "absolutely fine." (*Exhibit 4* at 13:53:50).

44. At approximately 13:55:45, Hoskinson again expressed concern as to Kraman's condition and asked if Kraman was in any danger and one of the paramedics told Hoskinson that he was not interfering with Kraman's treatment. (*Exhibit 4* at 13:55:45; 13:56:03).

45. Hoskinson spoke to Kraman in the back of the ambulance and asked Kraman about his medical condition and if his condition was livable to which Kraman responded in the affirmative. (*Exhibit 4* at 13:44:30).

46. Hoskinson told Kraman that he could wait to show him what was in the vehicle until after Kraman was done dealing with the paramedics and taking care of his medical condition. (*Exhibit 4* at 13:46:30).

47. Kraman testified that Hoskinson never told him that he could not go to the hospital and Kraman did not hear Hoskinson tell any of the paramedics that they could not take Kraman to the hospital. (*Exhibit 6* at 121-122).

48. Hoskinson told the paramedics that he would follow them to the hospital to finish the tickets if Kraman needed to be transported, and one of the paramedics responded, "I know you would." (*Exhibit 2* at 188; *Exhibit 4* at 13:56:03; *Exhibit 10* at 43).

49. Hoskinson left the parking lot in his squad car at approximately 14:07:25 and the ambulance left for the hospital at approximately 14:07:45. (*Exhibit 4* at 14:07:25, 14:07:45).

50. Kraman returned to the ambulance at approximately 13:53:58. (*Exhibit 4* at 13:53:58).

51. Hoskinson returned to the ambulance a second time at approximately 14:02:05 and discussed the traffic tickets with Kraman. (*Exhibit 4* at 14:02:05).

52. Jolie testified in his deposition that this traffic stop was "the strangest I've ever been a part of." (*Exhibit 12* at 21).

53. Kraman was issued two traffic tickets: one for driving a vehicle without a front license plate and one for the obstruction device on the rear license plate. (*Exhibit 1*, ¶ 12(p); *Exhibit 2* at 83, 245).

54. At approximately 14:04:12, Hoskinson told Kraman that he had previously been charged with aggravated mopery but when Kraman asked what aggravated mopery was, Hoskinson said that he made up the charge. (*Exhibit 2* at 105, 106, 109-110; *Exhibit 4* at 14:04:12).

55. At approximately 14:06:44, Hoskinson told Kraman that he had been charged with murder in 2012 but laughed after saying it. (*Exhibit 2* at 107-108, 109-110; *Exhibit 4* at 14:06:44).

56. The paramedics asked Kraman about his physical state. (*Exhibit 8* at 10, 21; *Exhibit 10* at 17-18, 20, 24; *Exhibit 14* at 13).

57. The paramedics took Kraman's vitals three times in approximately 34 minutes. (*Exhibit 6* at 59, 61; *Exhibit 9* at 2).

58. The paramedics used an ECG-Monitor II at 13:29, a 12-Lead ECG at 13:30 and an ECG-Monitor II at 14:00. (*Exhibit 9* at 2; *Exhibit 13* at 40-41).

59. Miller testified that Northwest Community Hospital, the resource medical facility for Mount Prospect Fire Department, was contacted but the hospital did not tell the paramedics to do anything as they had done everything they were supposed to do. (*Exhibit 10* at 73; *Exhibit 14* at 45).

60. The paramedics testified during their depositions that Kraman's care and treatment was based on specific sections of the Northwest Community Hospital Standard Operating Procedures that addressed Acute Coronary Syndrome ("ACS"). (*Exhibit 8* at 27-28; *Exhibit 10* at 39; *Exhibit 13* at 32; *Exhibit 14* at 45-51).

61. These orders label ACS patients as "Time Sensitive" and should be transported to the hospital within 30 minutes. (*Standard Operating Procedures/Standard Medical Orders Eff. June 1, 2014*, attached and referred to as *Exhibit 15* at 15; *see Exhibit 14* at 45).

62. The paramedics testified that Kraman was not transported to the Hospital within the prescribed time period. (*Exhibit 10* at 44; *Exhibit 14* at 51-52).

63. A paramedic needs a patient's consent in order to transport the patient to the hospital. (*Exhibit 10* at 29; *Exhibit 14* at 27, 30; *Exhibit 15* at 1).

64. Miller and Skalon testified that Kraman refused transport to the hospital in order to deal with the police. (*Exhibit 10* at 30-31; *Exhibit 13* at 9, 22-23, 50, 51).

65. Miller advised Kraman of the danger that he was in if he did not go to the hospital. (*Exhibit 10* at 38, 59).

66. After Hoskinson looked in in the vehicle, Kraman indicated that he wanted to go to the hospital. (*Exhibit 4* at 13:53:02; *Exhibit 13* at 62).

67. Miller testified that Kraman's condition was not an emergency and Kraman was not a "time sensitive" patient. (*Exhibit 10* at 38-39).

68. Kraman refused treatment at Northwest Community Hospital and left without any discharge papers. (*Exhibit 6* at 83, 85, 88).

69. Kraman received medical care and treatment during the time he was in the ambulance. (*Exhibit 6* at 59, 62, 63, 75-76, 123).

70. During his deposition, when Kraman was asked how he knew that Hoskinson knowingly and voluntarily participated in a scheme to unreasonably prolong the traffic stop, restrained his liberty to go to the hospital, illegally seized his property and engaged in harassment by informing him that he had a criminal record, the plaintiff replied, "[b]y his actions and what he was doing." (*Exhibit 6* at 136-37).

71. Kraman indicated that his evidence Miller knowingly and voluntarily participated in the scheme was that he did not take the plaintiff to the hospital. (*Exhibit 6* at 138).

72. Kraman was asked for the basis of his allegation that the Village personnel at the traffic stop agreed not to take him to the hospital through concerted action, and he indicated that he asked to go to the hospital several times and "they didn't move." (*Exhibit 6* at 139-41).

73. In response to a query about the evidence that the defendants conspired to use a legal traffic stop to keep him from going to the hospital, Kraman admitted that it was simply that they did not take him to the hospital. (*Exhibit 6* at 142).

74. Kraman has no idea as to when the defendants entered into an agreement to keep him from going to the hospital. (*Exhibit 6* at 142).

75. Kraman testified during his deposition that he did not know whether the alleged misconduct of Hoskinson was conducted by anyone else. (*Exhibit 6* at 151-153).

76. Kraman made a complaint with the Mount Prospect Police Department about his treatment during the May 10, 2015 traffic stop. (*Exhibit 6* at 97-100; *Exhibit 7* at 2, 3, 4).

77. The Mount Prospect Police Department investigated the complaint and at the conclusion of the investigation, the Mount Prospect Police Department sent Kraman a letter indicating that his complaint had been sustained in part as it was determined that Hoskinson conducted himself in a matter outside of department expectations while on duty. (*Exhibit 2* at 115; *Exhibit 6* at 100, 154; *Exhibit 7* at 2, 3).

78. The majority of Hoskinson's disciplinary infractions do not involve conduct that deprived others of their constitutional rights. (*Exhibit 2* at 140-176).

79. Kraman testified during his deposition that he did not know whether the alleged misconduct of Miller and other MPFD personnel at the May 10, 2015 traffic stop had occurred on more than one occasion. (*Exhibit 6* at 157-58).

80. Hoskinson's squad car was equipped with a video camera which was activated when Hoskinson turned on the vehicle's lights and audio equipment which was not automatically activated. (*Exhibit 2* at 95-96; *Exhibit 5* at ¶ 4-5, *Exhibit 12* at 27).

81. Hoskinson did not activate the audio equipment at the beginning of the traffic stop and the audio was not turned on until approximately 13:35:56. (*Exhibit 2* at 97-98, 226; *Exhibit 4* at 13:35:56; *Exhibit 5* at ¶16; Exhibit *6* at 95-96).

82. Hoskinson received a verbal reprimand from the Mount Prospect Chief of Police for failing to activate the microphone until 21 minutes into the stop which is a violation under MPPD MVR policy. (*Exhibit 7* at 2).

83. The video and audio recorded by the squad car and police officer are automatically downloaded. (*Exhibit 2* at 249, 250; *Exhibit 5* at ¶ 7).

84. The only way for a police officer to prevent video or audio from being preserved is to not record it in the first place. (*Exhibit 2* at 249, 250; *Exhibit 5* at ¶ 6-8).

85. Hoskinson reviewed the video between May 10, 2015 and May 15, 2015 and it was in the same form that it is in at the present time. (*Exhibit 2* at 207; *Exhibit 5* at ¶ 14-15).

86. No part of the video was altered, edited or manipulated in any way. (*Exhibit 2* at 207; *Exhibit 6* at 190).

        Respectfully submitted,

        THOMAS HOSKINSON, LLOYD MILLER and the VILLAGE OF MOUNT PROSPECT

        By:_____/s/Allen Wall_____

Allen Wall
Caitlyn R. Culbertson
KLEIN, THORPE AND JENKINS, LTD.
20 North Wacker Drive, Suite 1660
Chicago, Illinois 60606
(312) 984-6400