```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3    JEFFREY KRAMAN,                )
               Plaintiff,            )
 4        vs.                        )  1:16-cv-04960
      THOMAS HOSKINSON, #233,        )
 5    individually and as            )
      agent, servant or             )
 6    employee of the Mount          )
      Prospect Police               )
 7    Department, UNKNOWN            )
      MOUNT PROSPECT OFFICERS,       )
 8    MOUNT PROSPECT POLICE          )
      DEPARTMENT, a municipal        )
 9    corporation, LLOYD            )
      MILLER, individually and       )
10    as agent, servant or          )
      employee of Mount             )
11    Prospect Fire                  )
      Department, UNKNOWN FIRE       )
12    DEPARTMENT PERSONNEL,          )
      and MOUNT PROSPECT FIRE        )
13    DEPARTMENT, a municipal        )
      corporation,                   )
14          Defendants.              )
15
16             The deposition of LLOYD MILLER, called
17    for examination pursuant to the Rules of Civil
18    Procedure for the United States District Courts
19    pertaining to the taking of depositions, taken
20    before WENDY A. KILLEN, CSR Number 84-003772, a
21    Certified Shorthand Reporter in the State of
22    Illinois, at 221 North LaSalle Street, Suite 1320,
23    Chicago, Illinois, on April 12, 2017, at the hour
24    of 1:14 p.m.
```

EXHIBIT
tabbies
_/O_

Page 5

1   deposition.  One is that all of your answers have

2   to be out loud.  You can't say uh-huh or uh-uh.  It

3   just makes her angry.

4       A.   I understand.

5       Q.   The other rule is you have to wait until I

6   ask my complete question and then answer the

7   question and then we have a nice clear record.

8   Okay?

9       A.   Yes.

10      Q.   If at any time you want to take a break,

11  confer with counsel, use the bathroom, stretch your

12  legs, please feel free to do so at any time.  This

13  isn't an inquisition.  You are free to get up and

14  take a break any time you want.  The only rule is

15  if there's a question pending, then you have to

16  answer that question and then we can take the

17  break.  Okay?

18      A.   Yes.

19      Q.   What did you review in preparation for

20  today's dep?

21      A.   I went over the comprehensive document

22  that I wrote.

23      Q.   What comprehensive document?

24      A.   The EMS report.

1           Q.    Is there a particular part of that that

2     you actually entered into either the computer or

3     wrote?

4           A.    I wrote all of it.

5           Q.    You wrote the whole thing?

6           A.    Yes.

7           Q.    What else did you review?

8           A.    We reviewed the dash cam footage.

9           Q.    What dash cam footage?

10          A.    From the police car that was on the scene.

11          Q.    Was there dash cam footage from any other

12    vehicle other than the one police car?

13          A.    Not that I know of.

14          Q.    You are ambulance or fire truck?

15          A.    Ambulance.

16          Q.    Is there dash cam video capability in the

17    ambulance?

18          A.    No.

19          Q.    Is there dash cam capability in the fire

20    truck?

21          A.    No.

22          Q.    Was there more than one squad on the

23    scene?

24          A.    I believe so.

1      Q.   Do you know whether or not there is more

2   than one dash cam video?

3      A.   I do not know.

4      Q.   Did you review the whole video?

5      A.   Yes.

6      Q.   So you looked at the paramedic report,

7   which I think is Kraman Exhibit Number 2.  We are

8   going to show that to you in a minute to confirm.

9      A.   Yes.

10     Q.   What other documentation did you review in

11  preparation for today's deposition?

12     A.   The general order SOPs that were in effect

13  in 2015.

14     Q.   These are the standard operating

15  procedures when you say SOPs?

16     A.   Yes.

17     Q.   And these are the standard operating

18  procedures that were in effect at the time; is that

19  right?

20     A.   Yes.

21     Q.   What else?

22     A.   That's it.

23     Q.   I want to make sure that my question is

24  crystal clear.  I'm not asking what you reviewed

1      A.   Why he called us there that day.

2      Q.   Okay.  Is this before or after you asked

3  Hoskinson?

4      A.   I don't recall.

5      Q.   So you arrive at the scene, you go to

6  Hoskinson and you say what's up, why am I here, and

7  he says this guy says he has atrial fibrillation

8  and requested an ambulance.

9           Do I have that right?

10     A.   Sounds about right.

11     Q.   So then you went to Kraman and said what's

12  the problem?

13     A.   Generally, yes.

14     Q.   What do you mean generally?

15     A.   I don't remember the exact words I used.

16     Q.   What did Kraman say to you?

17     A.   Very little about his medical.  He was

18  very concerned about the police.

19     Q.   Well, what did he say to you that made you

20  think he was very concerned about the police?

21     A.   I would ask him a question, for example,

22  are you having pains because now I know why we were

23  called there, and he would not directly answer me.

24  He would ask a question about something going on

Page 18

1    with the police.

2        Q.   And where were you and he when you had

3    this conversation about pain?

4        A.   In the ambulance.

5        Q.   So I sort of missed the part where you

6    moved from talking to Kraman with Hoskinson there

7    over to the ambulance.

8            How did you get him to go in the

9    ambulance?

10       A.   I asked him to come with me.

11       Q.   And he did?

12       A.   Yes.

13       Q.   So he got in the back of the ambulance.

14           Was he sitting or in a cot?

15       A.   I know at one point he was in the cot.

16   Whether he went in there immediately, I don't know.

17       Q.   So he was sitting and/or in the cot,

18   either one, at sometime when he was in the

19   ambulance?

20       A.   Yes.

21       Q.   And so he was either sitting or in the cot

22   and you asked him are you in pain?

23       A.   Yes.

24       Q.   And he said what's that guy doing with my

1    questions?

2         A.    Medications.

3         Q.    Did he answer those questions?

4         A.    Yes.

5         Q.    Any other medical questions?

6         A.    If he was experiencing -- what symptoms he

7    was experiencing then.

8         Q.    Did he answer those questions?

9         A.    I don't recall that.

10        Q.    Well, you don't recall whether or not he

11   answered any questions about whether or not he was

12   experiencing any other symptoms?

13        A.    He was very obsessed with what was going

14   on outside of the ambulance.

15        Q.    You said like that four or five times.

16   That's not my question.

17        A.    Okay.

18        Q.    My question is:  Did he answer the

19   questions regarding his other symptoms?

20        A.    Some of them.

21        Q.    What question did he answer?

22        A.    His history on a-fib, his medications,

23   allergies, I know he answered those.

24        Q.    Which questions did he not answer about

1    his symptoms?

2         A.    I don't recall exactly.

3         Q.    All right.  How about in general?

4         A.    Generally, it took him a long time to

5    answer any direct questions I asked him.

6         Q.    My question to you was what questions did

7    he not answer, and you said I can't remember

8    specifically.  I said 'tell me generally what

9    questions did he not answer.

10        A.    Generally, I do not remember.

11        Q.    The questions that he did not answer, are

12   those in your report?

13        A.    No.

14        Q.    So when you said before that he took a

15   long time to answer the questions or he was evasive

16   about his answers, is there anything in your report

17   that indicates any refusal to answer any questions?

18        A.    Not that I can recall.

19        Q.    Let me show you what I have marked as

20   Kraman Exhibit 2 dated 3/9/17.

21        MR. SMITH:  Counsel, you've seen this?

22        MR. WALL:  Yes.

23        MR. SMITH:  I'm tendering that to the witness.

24

Page 22

1    BY MR. SMITH:

2        Q.    Review that and confirm that that's the

3    report that you prepared.

4        A.    Yes.    This is the report I prepared.

5        Q.    Now, point out to me in the report

6    anywhere it says Mr. Kraman refused to answer any

7    questions, specific questions or general questions.

8        A.    There is nothing in the report that says

9    he refused to answer questions.

10       Q.    Now, in the report you say that -- I'm

11   looking -- are you Bates numbered on yours?    I

12   don't think so.

13       MR. WALL:    Yes, he is.    It's right down here at

14   the very bottom.

15   BY MR. SMITH:

16       Q.    Can you turn to Page 14?

17       MR. WALL:    He has different Bates stamps,

18   counsel.

19   BY MR. SMITH:

20       Q.    Turn to where it says Page 3 on the

21   preprinted form there, Page 3.

22       MR. WALL:    Page 3.

23       THE WITNESS:    Oh, I see.    Okay.    I'm sorry.

24

1     because he was experiencing a-fib?

2          A.   Yes.

3          Q.   I'm going to keep reading.  Okay?

4          A.   Yes.

5          Q.   Quote, When we were able to keep him calm,

6     he had no pain.  He would continue to obsess about

7     the police causing him some chest pain and anxiety,

8     unquote.

9               Let me ask you a question about that.  You

10    say in here that he would continue to obsess about

11    the police.  When you wrote that, what did you

12    mean?  What was his obsession?

13         A.   I would ask him questions about how he was

14    feeling, his medical condition.  He would answer me

15    by talking about what was going on with the police,

16    his car.

17         Q.   Would it be a true statement to say that

18    he was much more concerned about Officer Hoskinson

19    than any other police officer?

20         A.   Yes.

21         Q.   So was the concern or the obsession

22    resulting in Mr. Kraman having chest pain and

23    anxiety?

24         A.   I'm sorry.  Can you please repeat that?

1    statement?

2         A.   No.

3         Q.   Why not?

4         A.   Had Mr. Kraman asked to go to the hospital

5    at that point, we would have transported him.

6         Q.   I thought he did ask to go to the

7    hospital.  It says right up here.

8              Remember I read you that part before where

9    he said he was on his way to the Good Shepard

10   Hospital and you asked Officer Hoskinson and

11   Officer Hoskinson said Kraman says I want to go to

12   the hospital?

13        MR. WALL:  I will object.  That

14   mischaracterizes Mr. Miller's testimony.

15   BY MR. SMITH:

16        Q.   Lloyd, tell me I'm wrong.

17        A.   Mr. Kraman stated he was driving to Good

18   Shepard Hospital.  That was not in my care.  Once

19   in my care, I needed permission to transport him to

20   the hospital.

21        Q.   I'm sorry.  I thought you said a while ago

22   in this deposition that when you arrived, Officer

23   Hoskinson said -- you asked him why am I here, why

24   is there an ambulance called, and he said Kraman

1    wants to go to the hospital?

2        A.    Yes.

3        Q.    That's what Hoskinson said?

4        A.    Said the patient said he had a-fib and

5    wanted an ambulance.

6        Q.    To go to the hospital; not to just sit

7    there?

8        A.    We assume the patients want to go to the

9    hospital.

10       Q.    Did you also talk to Kraman and ask him

11   did he want to go to the hospital?

12       A.    Yes.

13       Q.    And he said yes?

14       A.    No.

15       Q.    He said no?

16       A.    He did not say no.  He would answer me

17   with what's going on with my car and what's going

18   on with the police.

19       Q.    Let me keep reading.  Quote, He then

20   refused transport to deal with MPPD.  After that

21   was resolved, he decided to go with A1-14 again,

22   period.

23            Does that mean that after the concern and

24   obsession he had with the police was resolved, he

Page 31

1    then agreed to go to the hospital?

2         A.    Yes.

3         Q.    And let me understand your words here.

4    You said, He then refused transport to deal with

5    MPPD.

6              Where in the course of your treatment of

7    Mr. Kraman did he refuse transport, did he refuse

8    to go to the hospital?

9         A.    I asked the patient would you like

10   transport to the hospital.  He would not give me a

11   direct answer.

12        Q.    So you interpreted that as a refusal?

13        A.    Yes.

14        Q.    So you said do you want to go to the

15   hospital, do you want to go to the hospital, and he

16   didn't answer you?

17        A.    He would answer by asking me questions

18   about the police.

19        Q.    Right.  I'm talking about questioning

20   whether he wanted to go to the hospital.

21        A.    Right.  He was --

22        Q.    It sounds like -- I'm sorry.  I didn't

23   mean to interrupt you.

24        A.    I'm sorry.  He would answer that question

1      A.   No.

2      Q.   So you wrote seven lines in the narrative,

3   but nowhere in there did you say patient refused to

4   go to the hospital, period?

5      MR. WALL:  Again, objection.  It's

6   argumentative.

7           You can answer.

8   BY MR. SMITH:

9      Q.   Correct?

10     A.   Correct.

11     Q.   So you wrote, He then refused transport to

12  deal with the MPPD.  After that was resolved, he

13  decided to go with A1-14 again.

14          That statement, he decided to go with

15  A1-14 again, that means he had agreed to go to the

16  hospital?

17     A.   Yes.

18     Q.   Did you advise him of the danger that he

19  was in if he didn't go to the hospital?

20     A.   Yes.

21     Q.   Where is that in this record?

22     A.   It's not listed in the record.

23     Q.   Was this an emergency situation for

24  Mr. Kraman?

1       A.    No.

2            Q.    Was this a medically time-sensitive

3       situation for Mr. Kraman?

4       A.    No.

5            Q.    Let me show you what has been previously

6       marked as Clark Group Number 1.    This is Clark

7       Group Number 1 dated 4/3/17 and titled Standard

8       Operating Procedures/Standing Medical Orders dated

9       June 1, 2014.

10            Is that the SOPs you referred to that you

11      looked at previously in this case?

12       A.    Yes.

13            Q.    Is that the SOPs that would have applied

14      to you and your conduct during your interaction

15      with Mr. Kraman in 2015?

16       A.    Yes.

17            Q.    Let me direct you to Page 3.    Page 3 is an

18      index or table of contents.

19            Was your focus on the SOPs beginning on

20      Page 15?

21       A.    Yes.

22            Q.    Did you review the whole standard

23      operating procedure or did you focus on the cardiac

24      SOPs?

Page 43

1      A.    Yes.

2      Q.    One of the ways that you needed to do that

3   was to put electronic leads on his body?

4      A.    Yes.

5      Q.    That would give you the opportunity to get

6   information regarding his cardiac, his sinus

7   rhythm, his respiration, blood pressure, whatever

8   it is you are going to get from him?

9      A.    Yes.

10      Q.    You don't get blood pressure from leads,

11   but you get the cardiac information?

12      A.    Yes.

13      Q.    So you wrote on here PD was careful to not

14   interfere or delay with patient's medical care.

15            What did you mean when you wrote that?

16      A.    That PD stated if the patient wanted to go

17   to the hospital, we can take him.

18      Q.    So was it your understanding that the

19   police officer in this case, Hoskinson, was saying,

20   hey, you can take him any time you want, I'm not

21   stopping him?

22      A.    Yes.

23      Q.    And where in the process of your treatment

24   of Mr. Kraman did he say that?

1           When I say he, I mean Officer Hoskinson.

2      A.    Early on.

3      Q.    So why did this statement need to be in

4  this narrative?  What was the purpose of it?

5      A.    Because we were on scene for an extended

6  period of time.

7      Q.    So?

8      A.    Trying to give a little bit of reasons as

9  to why.

10     Q.    Wasn't this statement made to protect the

11 officer from any suggestion or allegation that he

12 was interfering with Mr. Kraman's medical

13 treatment?

14     MR. WALL:  Objection, form.

15          You can answer.

16     THE WITNESS:  No.

17 BY MR. SMITH:

18     Q.    So the purpose of putting this information

19 in the narrative that the police department wasn't

20 interfering with Mr. Kraman's medical treatment was

21 because you were on the scene for a long time; is

22 that your testimony today?

23     A.    We should explain why we are on scene for

24 an extended period of time.

1      Q.   I'm going to keep reading your narrative.

2   Okay?

3      A.   Yes.

4      Q.   It says, quote, Not transmitted as the

5   patient started to take off his leads and exited

6   the ambulance.

7           What does that mean, not transmitted?

8      A.   The 12 lead of his heart can be

9   transmitted to the hospital.

10     Q.   Okay.

11     A.   Mr. Kraman started ripping his leads off

12  of his chest and started to exit the ambulance.

13     Q.   Why was he doing that?

14     A.   He was very obsessed with what was going

15  on with his car by the police.

16     Q.   Did you advise Mr. Kraman of the danger of

17  not leaving the leads on and getting to the

18  hospital as soon as possible?

19     A.   Yes.

20     Q.   Is that documented?

21     A.   No.

22     Q.   Okay.  So he takes these leads off, he

23  gets out of the hospital (sic) and he has an

24  interaction with Officer Hoskinson?

1    contacted.  No further orders given.

2                What does that mean?

3         A.    Starting from the beginning, so the

4    patient, as we said, started taking off his own

5    leads to exit the ambulance on his own.  Northwest

6    Community Hospital, that's the letters there, they

7    are contacted by phone, standard procedure, and

8    they did not give any further orders.

9         Q.    Why not?

10        A.    There's nothing to give us.

11        Q.    Why not?

12        A.    Because we had done everything that we

13   were supposed to do.

14        Q.    Okay.  So Northwest Community Hospital

15   didn't give you any further orders because he had

16   taken off his leads; they didn't give you any

17   further orders because there's no orders to give?

18        A.    No.  They get a full verbal report on the

19   phone.  Sometimes they will tell us to do something

20   extra, something more.  They did not have anything

21   to tell us to do.

22        Q.    I want to make sure we are clear.  The

23   reason they didn't have any further orders is

24   unrelated to the fact that Kraman started to take

Page 82

1    BY MR. SMITH:

2         Q.    Let's look at the part of the memorandum

3    that refers to Lloyd Miller, you, Mr. Miller.

4    That's on Page 31.  I spoke with PMIC --

5              That's paramedic in charge, right?

6         A.   Correct.

7         Q.   -- Miller at 12:36 hours who related the

8    following in summary.  He was the primary caregiver

9    assigned to the ambulance on the day in question

10   and was dispatched to the post office parking lot

11   for a subject that was experiencing chest pains.

12   PMIC Miller related that upon the fire department's

13   arrival, he observed Officer Hoskinson search

14   Mr. Kraman and directed Mr. Kraman to the members

15   of the fire department, giving the fire department

16   immediate access to Mr. Kraman.

17             PMIC Miller specifically related that

18   Mr. Kraman was told that the fire department was on

19   scene to address any medical issues he was

20   experiencing.  PMIC Miller described Mr. Kraman as

21   anxious and that he seemed overly concerned with

22   what the police were going to do with his vehicle.

23             PMIC Miller was asked if he heard any

24   specific interactions between Officer Hoskinson and

1    Mr. Kraman and he related that Mr. Kraman offered
2    to let Officer Hoskinson see the interior of the
3    car after Officer Hoskinson questioned him about
4    the tarp in the back of the vehicle that was
5    apparently covering an unknown object or item.

6            PMIC Miller, when asked, confirmed that he
7    heard Officer Hoskinson call Mr. Kraman a criminal
8    and that he had been arrested for mopery.  PMIC
9    Miller related that Officer Hoskinson allowed
10   Mr. Kraman to hear the dispatcher summarize
11   Mr. Kraman's criminal history when he had disputed
12   why he had been previously arrested.

13           When PMIC Miller was specifically asked if
14   he heard Officer Hoskinson tell Kraman that he was
15   arrested for murder in 2012, PMIC Miller related
16   that he didn't remember hearing that comment.  PMIC
17   was asked if he felt the comments that Officer
18   Hoskinson said were offensive and/or insulting, and
19   PMIC Miller related that he felt that was simply
20   Officer Hoskinson's personality, he was just being
21   himself.  PMIC Miller never felt that Officer
22   Hoskinson was being confrontational with
23   Mr. Kraman.

24           Did I read that correctly?

Page 84

1        A.   I believe so, yes.

2        Q.   Is everything in that paragraph correct as

3    it relates to your statements and your

4    observations?

5        A.   Yes.

6        Q.   What's mopery?

7        MR. WALL:  Objection, form.  It calls for a

8    legal conclusion.

9        MR. SMITH:  I don't know if it does.

10   BY MR. SMITH:

11       Q.   What's mopery?

12       MR. WALL:  That's still the objection.

13            You can answer if you are able to.

14       THE WITNESS:  I don't know.

15   BY MR. SMITH:

16       Q.   So as you sit here now, do you or do you

17   not recall Officer Hoskinson telling Mr. Kraman he

18   was arrested for murder in 2012?

19       A.   I think I do remember it.

20       Q.   So how did that happen?

21            Did Hoskinson say I've got a report or did

22   he open his mic and let Kraman hear the statement

23   from the dispatcher?

24       A.   The dispatcher's statements came a little

Page 112

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF C O O K )

4

5           I, Wendy A. Killen, a certified shorthand

6    reporter in the State of Illinois, do hereby

7    certify:

8           That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12          That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17          That the said deposition was taken before

18   me at the time and place specified;

19          That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24

Page 113

1          IN WITNESS WHEREOF, I do hereunto set

2    my hand at Chicago, Illinois, this 18th of

3    April 2017.

4                    Wendy A. Keller

5

6                    Certified Shorthand Reporter

7                    CSR Certificate No. 84-003772

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24