**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY KRAMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 4960** |
| | ) | |
| **THOMAS HOSKINSON, UNKNOWN** | ) | |
| **MOUNT PROSPECT OFFICERS,** | ) | |
| **LLOYD MILLER, UNKNOWN FIRE** | ) | |
| **DEPARTMENT PERSONNEL, and** | ) | |
| **VILLAGE OF MOUNT PROSPECT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jeffrey Kraman has sued Thomas Hoskinson, Lloyd Miller, other unknown police officers and medical technicians of the Mount Prospect Police Department and the Mount Prospect Fire Department, and the Village of Mount Prospect under 42 U.S.C. § 1983 and state law for claims arising from what he contends was an unlawful traffic stop. The defendants have moved for summary judgment.

### Background

On May 10, 2015, Thomas Hoskinson, a Mount Prospect police officer, pulled over Jeffrey Kraman's vehicle after seeing that his license plate was obscured by a plastic device that made the plate difficult to read at an angle. Kraman pulled his minivan into the parking lot of a post office, and Hoskinson parked his car behind Kraman's. As Hoskinson approached Kraman's vehicle, Kraman, who suffered from

heart conditions in the past, informed Hoskinson that he was experiencing atrial fibrillation. Hoskinson called an ambulance for Kraman and returned to his car to wait for the ambulance. The ambulance arrived at 1:23 pm, eight minutes after the traffic stop was initiated at 1:15 pm. D.E. 61, Defs.' Ex. 9 (Fire Dept. records). The ambulance stopped about thirty feet to the left of Kraman's vehicle.

After the ambulance arrived, paramedics began to render treatment to Hoskinson. An ECG monitor confirmed Kraman was in atrial fibrillation. One paramedic later testified that Kraman "definitely did need to go to the hospital." D.E. 61, Defs.' Ex. 8 at 27 (Ingebrigtsen Dep.). As the paramedics were treating Kraman, Hoskinson removed the item obstructing Kraman's license plate and looked into the vehicle's windows. Lloyd Miller, another paramedic, later testified that "[Kraman] was very obsessed with what was going on outside the ambulance" and that his interest in what the police were doing made it difficult to determine if he wanted to go to the hospital. D.E. 61, Defs.' Ex. 10 at 20, 30 (Miller Dep.).

Hoskinson, who peered into Kraman's minivan through the passenger and rear windows of the vehicle, observed two things that he found suspicious: a blanket covering what he says he thought was a dead body and a number of coffeemakers. Hoskinson says he also found Kraman's driver's license suspicious, as the reverse side of the license was blank, even though Illinois driver's licenses typically have information printed there.

Hoskinson approached Kraman, who was still in the ambulance, to question him about the objects in his van. When Kraman asked Hoskinson if he was under arrest, Hoskinson told Kraman he was being "detained" but then told Kraman he was under the

control of the Mount Prospect Fire Department. D.E. 61, Defs.' Ex. 5 (dashcam video). Hoskinson said he "want[ed] to look inside" the van, *id.*, but Kraman declined. Kraman volunteered to show there was no body in the van. Though it is not clear from the video whether Kraman or Hoskinson moved the tarp, Hoskinson looked under the tarp and realized that there was no dead body—just additional coffeemakers. Kraman explained that he had so many appliances because he was a wholesaler who sold businesses items that could be used in promotional activities. Hoskinson asked Kraman for a business card to confirm that he really operated a promotions business, and Kraman provided him one. *Id.*

Kraman also had gift receipts from Bed, Bath, and Beyond for the coffeemakers, which he showed Hoskinson at approximately 1:50 p.m. Hoskinson says that, like the coffeemakers, the driver's license, and Kraman's heart condition, he found the gift receipts suspicious—he they could be part of a scheme to defraud Bed, Bath, and Beyond. Hoskinson told another officer to call Bed, Bath, and Beyond to inquire about the gift receipts while Hoskinson wrote traffic citations to issue to Kraman. Kraman, in the meantime, parked his minivan in a spot in the lot and, though it is not clear from the video, returned to the ambulance for treatment.

It is unclear from the record exactly how long Hoskinson took to write the citations and how long, if at all, he waited for the other officer to conclude the call with Bed, Bath, and Beyond. Hoskinson walked to the ambulance to explain the two citations. The first was for the device obstructing the view of Kraman's license plate, which is illegal in Illinois. The second was for Kraman's missing front license plate. Hoskinson then told Kraman that he had checked Kraman's arrest history and that it

showed he was a "criminal."  *Id.*  Kraman wanted to know if, by signing the tickets, he was saying he was "guilty."  Hoskinson said no and then, after an exchange that is difficult to parse from the audio, asserted that Kraman had been arrested in 1977.  Kraman did not believe he had been arrested in that year, and asked Hoskinson on what basis he had been arrested.  Hoskinson made up a charge:  "aggravated mopery." *Id.*

Hoskinson then took the citations back to his car and spoke with the second officer, who said that Bed, Bath, and Beyond did not report any fraudulent activity relating to the gift receipts.  When Hoskinson returned to the ambulance a second time with the citations, Kraman asked him to explain why Hoskinson had said he (Kraman) had been arrested.  First, Hoskinson stated that "if you've been arrested, you're a criminal."  After Kraman asked again why Hoskinson believed he had been arrested, Hoskinson radioed the police station, which repeated Kraman's criminal history, consisting of two arrests for unclear charges, the last of which was in 1977.  When Kraman asked Hoskinson to confirm his understanding of what the police station had said, Hoskinson said:  "No, he said you were arrested for murder in 2012."  *Id.*  This was untrue.  Kraman asked an additional question about what it meant to be arrested.  The officers then left as the ambulance departed.

Later, Kraman filed a complaint with the Mount Prospect Police Department regarding Hoskinson's conduct during the search.  The department partially sustained Kraman's complaint, finding that Hoskinson made "some inappropriate comments," but without identifying what specifically was inappropriate.  Hoskinson received a verbal reprimand.  The department cleared Hoskinson of any wrongdoing for the stop itself.

D.E. 61, Defs.' Ex. 7 (administrative review letter).

A dashboard camera on Hoskinson's car captured the encounter, although some of the activity occurred outside the view of the camera. Hoskinson had a microphone attached to his person to pick up audio, but it was not activated until midway through the encounter.[1]

## Discussion

Kraman asserts claims against Hoskinson and other unnamed Mount Prospect police officers, Miller and other unnamed Mount Prospect paramedics, and Mount Prospect. Kraman alleges spoliation of evidence against Hoskinson and Mount Prospect (count 1); illegal seizure against Hoskinson (count 2); false imprisonment against Hoskinson and Miller (count 3); civil conspiracy against all defendants (count 4); and willful and wanton misconduct against all defendants (count 5). Kraman also alleges that the Village is liable under *Monell* (counts 6 and 7).

The defendants have moved for summary judgment on all of Kraman's claims. On a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is inappropriate when there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *Id.* The evidence in the record must be viewed in the light most favorable to the nonmoving party. *Id.*

## I. Count 1

In count 1, Kraman asserts a spoliation of evidence claim against Hoskinson and

---

[1] The Court notes the defendants' arguments regarding Kraman's compliance with Local Rule 56.1 and has relied primarily on videotape and deposition evidence.

the Village. He contends that Hoskinson, the police department, or both either lost or destroyed a portion of the audio recording accompanying the video evidence. The defendants argue there is nothing in the record tending to show that the missing portion of the audio recording ever existed. Rather, they contend, Hoskinson forgot to turn his microphone on until midway through the encounter, conduct for which the Department later reprimanded him. D.E. 61, Defs.' Ex. 7 (administrative review letter). Kraman now concedes that "the audio never existed" and asks for voluntary dismissal of the claim without prejudice. Pl.'s Resp. to Defs.' Mot. for Summ. J. at 15.

The Seventh Circuit employs a four-factor test to assess whether a voluntary dismissal should be with or without prejudice: "[t]he defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant." *Kunz v. DeFelice*, 538 F.3d 667, 677-78 (7th Cir. 2008) (citation omitted). Of these four factors, two are relevant here, and both support dismissal with prejudice: (1) Kraman has not explained why dismissal without prejudice is necessary, and (2) defendants have filed a motion for summary judgment. The Court dismisses the claim with prejudice.

## II.    Count 2 and 3

In count 2, Kraman asserts a claim under 42 U.S.C. § 1983 against Hoskinson for illegal seizure in violation of the Fourth Amendment. In count 3, Kraman alleges that Hoskinson and Miller improperly restrained him in violation of the Fourth Amendment. In their briefs on defendants' summary judgment motion, the parties collapse both claims into a general discussion of whether a Fourth Amendment violation occurred.

6

The Court addresses each defendant separately.

**A.    Hoskinson**

Kraman alleges that Hoskinson illegally seized and detained him in violation of the Fourth Amendment.  "Temporary detention of individuals during the stop of an automobile by the police, even if for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment]."  *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  Kraman contends that the "lawful roadside stop" became unlawful when Hoskinson unreasonably prolonged the stop to investigate the origin of the coffeemakers or to verbally spar with Kraman.   Pl.'s Resp. to Defs.' Mot. for Summ. J. at 8-9.  Hoskinson argues that he is entitled to summary judgment on two grounds:  (1) he did not unreasonably detain Kraman and (2) even if he did, he is entitled to qualified immunity for his actions.

First, Hoskinson argues that he reasonably detained Kraman beyond the scope of the traffic stop to inquire into the "dead body" and other circumstances that he reasonably found suspicious.  A traffic stop should "last no longer than is necessary to effectuate the purpose of the stop," unless something occurs to give the officer reasonable suspicion to prolong the stop.  *Valance v. Wisel*, 110 F.3d 1269, 1276 (7th Cir. 1997).  "An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime."  *United States v. Uribe*, 709 F.3d 646, 649-50 (7th Cir. 2013) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

Hoskinson had reasonable suspicion to make the traffic stop, based on his observation of a device affixed to Kraman's rear license plate that obscured the plate.

While Kraman was being treated in the ambulance, Hoskinson saw in Kraman's car something under a tarp that, at the time, he says he believed was a body. Assuming that belief was reasonable, the presence of a dead body certainly would give rise to reasonable suspicion that would permit prolonging the stop. Yet Kraman willingly showed Hoskinson the household appliances under the tarp at approximately 1:45 p.m., debunking the claim that he was concealing a body. Despite this, Kraman's detention continued until approximately 2:05 p.m. In the intervening twenty minutes, Hoskinson and another officer pressed Kraman on the origin of the coffeemakers in the backseat of his minivan. In addition to the fact that it is highly unlikely that the mere presence several coffeemakers suggests the commission of crime, Kraman immediately offered gift receipts along with an explanation for why he had the appliances. D.E. 61, Defs.' Ex. 5 (dashcam video). Hoskinson claims that the existence of gift receipts was suspicious and suggestive of criminal activity, but a reasonable jury could find this lacking in credibility and/or unreasonable. In short, there is a genuine factual dispute that is material regarding whether Hoskinson's investigation into Kraman's gift receipts inappropriately extended the length of the stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) ("The critical question, then, is not whether the [search] occurs before or after the officer issues a ticket . . . but whether conducting the [search] 'prolongs'—i.e., adds time to—'the stop.'").

Hoskinson also contends that the traffic stop was prolonged not because of his actions but because of Kraman's medical condition. He seems to suggest that Kraman remained at the scene not because Hoskinson kept him there but because he was under the control of the paramedics or, perhaps, because Kraman wanted to stay there.

A reasonable jury could find, however, that the traffic stop was prolonged, and Kraman remained at the scene, due to Hoskinson's apparent interest in furthering his investigation regarding the coffee makers. Among other things, there is evidence that Hoskinson was aware the paramedics were waiting for him to give them the okay before transporting Kraman to the hospital.

Hoskinson also contends that, even if his conduct may have violated Kraman's Fourth Amendment rights, he is entitled to qualified immunity. This defense involves two questions. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). The first is whether the officer's actions were supported by "arguable" reasonable suspicion. *Rouei v. Village of Skokie*, 61 F. Supp. 3d 765, 778 (N.D. Ill. 2014) (citing *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014)). Although this standard is broader than the underlying reasonable suspicion inquiry, Hoskinson is still not entitled to summary judgment, as a reasonable factfinder could find Hoskinson's explanation for prolonging the stop as lacking credibility or patently unreasonable.

The second question is whether the defendant's conduct violated the plaintiff's "clearly established" rights. *Huff*, 744 F.3d at 1003-04. An individual detained during a traffic stop has a clearly established right not to be detained longer than necessary to carry out the original purpose of the stop, unless the circumstances provide the officer reasonable suspicion that a crime has been or is about to be committed and further investigation is required. *See, e.g., Rodriguez*, 135 S. Ct. at 1616; *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005); *Valance*, 110 F.3d at 1275. There is no viable contention that this right was not clearly established at the relevant time. Kraman has not cited any case that involves the particular circumstances of this one, but "a case

directly on point is not required for a right to be clearly established and officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Becker v. Elfreich*, 821 F.3d 920, 929 (7th Cir. 2016) (citation omitted). This case involves a situation in which the original basis for the stop called for only a short detention to issue a citation, but the stop was then repeatedly prolonged by what reasonably is viewed as a series of made-up reasons. Any reasonable police officer would understand that such conduct violated clearly established law.

### B. Miller

In count 3, Kraman contends that Miller falsely imprisoned him in violation of the Fourth Amendment. In response to the defendants' motion for summary judgment, Kraman contends that Miller was an "active player" in his detention by declining to take Kraman to the hospital. Pl.'s Resp. to Defs.' Mot. for Summ. J. at 9. It is apparent from the dashcam video and audio that it was unclear whether Kraman wanted to travel with the paramedics to the hospital or instead drive himself. D.E. 61, Defs.' Ex. 5 (video); *see also id.*, Defs.' Ex. 10 at 20, 30 (Miller Dep.). Moreover, even if Kraman had asked to go to the hospital and Miller refused to take him there, that would not provide the predicate for a Fourth Amendment claim, which requires a restraint of liberty by means of physical force or a show of authority. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). Miller is entitled to summary judgment on count 3.

### IV. Count 4

Kraman alleges in count 4 that the defendants conspired to violate his constitutional rights. To establish a claim of conspiracy, a plaintiff must establish (1) the existence of an agreement to deprive the plaintiff of his constitutional rights and (2)

either overt agreement or acts that are sufficient to raise the inference of mutual understanding that actually deprive the plaintiff of those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

Kraman's claim founders on the requirement of evidence that would permit a reasonable jury to find an agreement. Kraman notes that the defendants each engaged in unreasonable conduct—Hoskinson's dogged investigation of Kraman and the paramedics' delay in taking him to the hospital—but there is no evidence permitting a finding that these events took place as part of a mutual understanding, which is needed to sustain a conspiracy claim. *Beaman*, 776 F.3d at 510. The only arguments Kraman offers in response are the "vague" and "conclusionary" arguments that the Seventh Circuit has held are insufficient to defeat a summary judgment motion. And a contention that others "went along" with Hoskinson's conduct does not allow a reasonable inference of "an agreement among the defendants to deprive him of a constitutional right." *Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999). The defendants are entitled to summary judgment on count 4.

## V.  Count 5

In count 5, Kraman sues each individual defendant on a claim entitled "willful and wanton misconduct." Though there is no such independent tort under Illinois law, *see Ziarko v. Soo Line Railroad Co.*, 161 Ill. 2d 267, 274, 641 N.E.2d 402, 406 (1994), count 5 is best read as a claim of false arrest / false imprisonment, with an allegation that the defendants acted willfully and wantonly as Illinois law defines that term. The latter allegation is made to avoid a bar imposed by the Illinois Tort Immunity Act, because that statute creates an exception for injuries arising from willful and wanton conduct. 745

ILCS 10/2-202. For the reasons described earlier in discussing Kraman's parallel constitutional claims, Miller is entitled to summary judgment on this claim, but Hoskinson is not.

## VI.  Counts 6 and 7

In counts 6 and 7, Kraman asserts claims under 42 U.S.C. § 1983 against the Village of Mount Prospect. A municipal entity may be liable under section 1983 only if the constitutional wrong was caused by the municipality's "policy or custom." *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 694 (1978).

In count 6, Kraman alleges that the Village is liable under *Monell* in connection with Hoskinson's misconduct. He contends that the police department's willingness to keep Hoskinson on the force without further training amounted to deliberate indifference to citizens' rights. A municipality may be liable if an officer "so often violate[s] constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). *See also Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

Kraman has presented evidence of a significant number of disciplinary actions against Hoskinson over the course of his service as a police officer. *See* D.E. 61, Defs.' Ex. 2 at 141-76 (Hoskinson Dep.). But Hoskinson's previous infractions—such as driving his police cruiser through a snow bank or arguing with supervisors—do not involve conduct at all similar to that involved in this case, and the Village's actions vis-à-vis Hoskinson are insufficient to permit a reasonable jury to find that it was deliberately indifferent to violations of constitutional rights. *See Jenkins*, 487 F.3d at 493 (holding a

plaintiff cannot establish deliberate indifference based upon a series of police shootings, as the shootings were not considered constitutional violations). The Village is entitled to summary judgment on count 6.

Count 7 asserts a *Monell* claim against the Village arising from Miller's alleged constitutional violations. Because the Court has concluded that Miller is entitled to summary judgment, Kraman cannot maintain this claim against the Village. "[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010).

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment in part and denies it in part [dkt. no. 63]. The defendants are entitled to summary judgment on count 1, 4, 6, and 7. On counts 3 and 5, the Court grants summary judgment in favor of Miller and the other unnamed individual defendants. The Court otherwise denies defendants' motion. This leaves for trial counts 2 and 3, Fourth Amendment claims that appear to be duplicative of each other, and count 5, a state-law claim, all against defendant Hoskinson only. The case is set for a status hearing on March 26, 2018 at 9:30 a.m. to set a trial date and discuss the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 12, 2018